**UNITED STATES v. MICHELSON.**
No. 130, Docket 20818.

Circuit Court of Appeals, Second Circuit.
Jan. 26, 1948.

Writ of Certiorari Granted April 5, 1948.

J. Vincent Keogh, of Brooklyn (Mario Pittoni, of Brooklyn, of counsel), for appellee.

Louis J. Castellano, of Brooklyn, N. Y., for appellant.

Before SWAN, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

### The Second Count.

We think that Congress, as it lawfully may, provided that to "offer" a bribe and to "give" a bribe are two distinct crimes even when parts of a single transaction, since the one (to "give") involves an element which the other (to "offer") does not.[1] The test, as stated in Morgan v. Devine, 237 U.S. 632, 640, 35 S.Ct. 712, 714, 59 L.Ed. 1153, is whether "separate acts have been committed with the requisite criminal intent. * * *" The present case does not meet that test. Kratter, the principal government witness, testified as follows: On July 17, 1946, in New York City,[2] defendant offered him a bribe of $5,-000, and he told defendant he would take it.[3] Defendant then said that, when he had the money, he would telephone Kratter. On July 26, defendant, on the telephone, told Kratter that he had the money and wanted to meet Kratter to give it to him. On July 29, Kratter by phone, arranged with defendant for a meeting at a room in the St. George Hotel in Brooklyn.[4] Kratter went to that room. His own words, as to what then occurred, follow: "A few minutes later there was a knock on the door. I opened the door and Mr. Michelson came in, and I closed the door after him. He dropped a package on a dresser or chifferobe, something like that that was in the hotel room, and he sat down and I sat down. I asked him if he had the money, and he said, 'Yes, it is in the bag over there.' I took the bag, unwrapped it, and he took out a large number of five, ten and twenty-dollar bills, and he said, Mr. Michelson said, 'There is $5,-000 there.' I made a quick count of the bills and satisfied myself that there was approxi-

---

[1] Blockburger v. United States, 284 U. S. 299, 303, 304, 52 S.Ct. 180, 76 L.Ed. 306; Albrecht v. United States, 273 U. S. 1, 11, 47 S.Ct. 250, 71 L.Ed. 505; Burton v. United States, 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057; Morgan v. Devine, 237 U.S. 632, 35 S.Ct. 712, 59 L. Ed. 1153; Gavieres v. United States, 220 U.S. 338, 342, 31 S.Ct. 421, 55 L.Ed. 489; Lindsay v. United States, 10 Cir., 134 F. 2d 960, 961; cf. American Tobacco Co. v. United States, 328 U.S. 781, 787, 788, 66 S.Ct. 1125, 70 L.Ed. 1575.

[2] New York City is in the Southern District of New York.

[3] Kratter's testimony as to that conversation is as follows:
"Q. Did you and Mr. Michelson have a conversation while you were walking along together? A. Yes, a conversation ensued during the walk. Mr. Michelson kept insisting that I do something to straighten out his tax return and fix things up for him so he wouldn't get into too much trouble. He offered me $3,000 while we were walking toward the subway, and then he said, 'Make it $5,000.' I told him I wouldn't touch that kind of money, I wasn't interested in it, I didn't want to get mixed up in that situation. Then he kept insisting. We had walked about two or three blocks from his office, and I finally stopped in the street and kept talking to him. He refused to leave me, and insisted that we come to some sort of agreement regarding his tax situation. I finally told him—he said, 'Will you take $5,000?' And he told me he would pay another $5,000 to the Government. I finally said, 'O.K.,' in order to get away from him, and he told me he would call me up when he had the money, and he asked me for my business card and home telephone. I gave him one of my cards and wrote down the phone number while we were standing on the street, and then we parted."

[4] Brooklyn is in the Eastern District of New York.

mately $5,000 in the package * * *." Defendant's conduct at that meeting in Brooklyn constituted his performance of the agreement of July 17—an illegal bargain resulting from a previously accepted offer—to give the $5,000 bribe. He did not on that day or at any other time in the Eastern District both offer and give. He merely gave.[5]

■ The offer of July 17 cannot sustain the conviction on count 2. For defendant made that offer in New York City in the Southern District, and the defendant was indicted and tried in the Eastern District. Had that offer been specified in the indictment, defendant, thus warned of the improper venue, would have waived the lack of proper venue by going to trial without interposing an objection.[6] The same might have been true if, during the trial, defendant had in some manner been put on notice that the government intended to rely on that New York City offer as a crime, for which he was being tried. But here there was nothing so to notify him. Indeed, the trial judge, in his charge, told the jury that the issue was whether defendant gave or offered to give, or both, $5,000 to Kratter on July 29 at the Hotel St. George. We therefore conclude that we must reverse as to the second count.

*Alleged Errors as to the First Count.*

1. The defendant called three character witnesses who testified that he had an excellent reputation for "honesty, truthfulness and being a law-abiding citizen." On cross-examination, they were asked whether they had heard (a) that in 1927 he had been convicted in a New York court and sentenced to pay a fine of $100 or 30 days in jail, and (b) that in 1920 he had been arrested for receiving stolen goods.

■ The judge, out of the jury's presence, received the assurance of the government's counsel that defendant had been thus arrested in 1920. The defendant, on the witness stand, had previously admitted the conviction in 1927. The judge, when these witnesses were being questioned, said: "However, I instruct the jury that what is happening now is this: the defendant has called character witnesses, and the basis for the evidence given by those character witnesses is the reputation of the defendant in the community, and since the defendant tenders the issue of his reputation the prosecution may ask the witness if she has heard of various incidents in his career. I say to you that regardless of her answer you are not to assume that the incidents asked about actually took place. All that is happening is that this witness' standard of opinion of the reputation of the defendant is being tested. Is that clear?" In his charge to the jury, the judge said: "In connection with the character evidence in the case I permitted a question whether or not the witness knew that in 1920 this defendant had been arrested for receiving stolen goods. I tried to give you the instruction then that that question was permitted only to test the standards of character evidence that these character witnesses seemed to have. There isn't any proof in the case that could be produced before you legally within the rules of evidence that this defendant was arrested in 1920 for receiving stolen goods, and that fact you are not to hold against him; nor are you to assume what the consequences of that arrest were. You just drive it from your mind so far as he is concerned, and take it into consideration only in weighing the evidence of the character witnesses." The questions were of the kind often held proper in examining "character witnesses."[7] That being the rule, we see no abuse of discretion in per-

---

[5] Kratter testified that after he had thus received the money, "I asked Mr. Michelson what he wanted me to do for the money, and he told me he wanted me to turn in a report which would indicate that he owed about $1,200 on his 1943 tax return and about $900 on his 1942 return. He said that was all he wanted me to do. Then I told him, 'You understand the only reason I am doing this is because you insist upon it, isn't that so?' And he said, 'Yes, that is right.'"

This conversation did not show a new offer but merely arrangements for carrying out the details of the previous agreement.

[6] United States v. Jones, 2 Cir., 162 F. 2d 72.

[7] See, e.g., Mannix v. United States, 4 Cir., 140 F.2d 250, 252; Josey v. United States, App.D.C., 135 F.2d 809, 811; Spalitto v. United States, 8 Cir., 39 F. 2d 782, 785–787; cf. Stewart v. United States, App.D.C., 104 F.2d 234, 235.

mitting them to be asked here.[8] Defendant asserts error in putting the question about the 1920 arrest to a witness who had known defendant only since 1932. We cannot agree, for she might have heard rumors of an arrest which happened before she knew him.

██ 3. On direct examination by his own counsel, defendant testified to his conviction in 1927 on a charge of possessing counterfeit watch-dials, but that he had no other trouble since he had been in the United States. On cross-examination, defendant testified that, in 1930, in an application signed by him for a license for vending second-hand jewelry, he had never been arrested for any offense. Thereupon he was asked whether he had stated in this application that he had been convicted of "counterfeiting trade-marks on watches." His counsel objected on the ground that the conviction had been for "possession of counterfeit." The court said, "Sustained on that ground." Government counsel then asked, "You did not say in that paper that you had been arrested and that you were convicted of that charge?" No objection was made. We find no prejudicial error.

██ 4. Defendant complains that the judge in his charge unfairly interpreted the testimony of a witness, Osterfeld, in a manner prejudicial to defendant. We think the interpretation not unfair. But, even assuming the contrary, there is no reversible error. In the first place, defendant did not object to this part of the charge.[9] In the second place, the judge made it plain that, despite his comments on the evidence, the jury were to rely on their own recollection of the evidence.

Affirmed as to the first count; Reversed as to the second.

---

[8] Wigmore, Evidence (3d ed. 1940) § 988, after noting that "such inquiries are almost universally admitted," not as "Impeachment by extrinsic testimony of particular acts of misconduct," but as means of testing the character "witness' grounds of knowledge," continues with these comments: "But the serious objection to them is that practically the above distinction—between rumors of such conduct, as affecting reputation, and the fact of it as violating the rule against particular facts—cannot be maintained in the mind of the jury. The rumor of the misconduct, when admitted, goes far, in spite of all theory and of the judge's charge, towards fixing the misconduct as a fact upon the other person, and thus does three improper things,—(1) it violates the fundamental rule of fairness that prohibits the use of such facts, (2) it gets at them by hearsay only, and not by trustworthy testimony, and (3) it leaves the other person no means of defending himself by denial or explanation, such as he would otherwise have had if the rule had allowed that conduct to be made the subject of an issue. Moreover, these are not occurrences of possibility, but of daily practice. This method of inquiry or cross-examination is frequently resorted to by counsel for the very purpose of injuring by indirection a character which they are forbidden directly to attack in that way; they rely upon the mere putting of the question (not caring that it is answered negatively) to convey their covert insinuation. The value of the inquiry for testing purposes is often so small and the opportunities of its abuse by underhand ways are so great that the practice may amount to little more than a mere subterfuge, and should be strictly supervised by forbidding it to counsel who do not use it in good faith."

Because, as Wigmore says, the jury almost surely cannot comprehend the judge's limiting instruction, the writer of this opinion wishes that the United States Supreme Court would tell us to follow what appears to be the Illinois rule, i.e., that such questions are improper unless they relate to offenses similar to those for which the defendant is on trial. See Aiken v. People, 183 Ill. 215, 55 N.E. 695; cf. People v. Hannon, 381 Ill. 206, 44 N.E.2d 923.

[9] See United States v. Marino, 2 Cir., 141 F.2d 771.

Nor did he object to a question the judge put to that witness, a question, moreover, which we think entirely proper.