THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
HARRY BURRETT, Defendant-Appellant.

First District (3rd Division) No. 1—89—0450

Opinion filed June 26, 1991.

Joshua Sachs, of Chicago, for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Walter P. Hehner, and Miles J. Keleher, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial, defendant Harry Burrett was found guilty of aggravated arson, arson, conspiracy and solicitation. The court sentenced him to 18 years of imprisonment.

On appeal the defendant alleges that (1) the State failed to prove that defendant knew or had reason to know that the arsoned premises were occupied as required for conviction under the aggravated arson statute; (2) the State's closing argument on the issue of what defendant might have reasonably known was based on evidence not in the record; and (3) the sentence of 18 years was too harsh. For the reasons set forth below, we affirm.

The facts are not greatly in dispute. About 4 a.m. on July 6, 1986, the home of the Waheed family was intentionally set on fire by Molotov cocktails. John Barnes, Richard Hudgins and defendant admitted that they participated in the firebombing of the Waheed home and that racial prejudice motivated their actions.

John Barnes pleaded guilty to aggravated arson and received a six-year term of imprisonment. In his written statement to the police and his trial testimony, Barnes recounted the events surrounding the fire. The night of July 5, 1986, Barnes was drinking and socializing with friends at Richard Hudgins' house until approximately 1:30 a.m., when Barnes and Hudgins left to go to Barnes' house. While walking to Barnes' house, they met defendant, who was driving down the street.

At the time of the incident, defendant was about 42 years old and for many years had resided about a block from the Waheed home. Barnes and Hudgins were both about 19 years old at the time of the crimes and had known the defendant since they were 10 and 6, respectively. For many years both had been friends of defendant's son.

The three men (Barnes, Hudgins and defendant) then went to defendant's home, where much of their ensuing conversation revolved

around "black people moving into our block." Barnes testified that defendant suggested that "we should get them out, burn their house down, *** get some Molotov cocktail bombs and set the house on fire." Hudgins admitted having prior discussions regarding black people moving into the neighborhood and all apparently agreed that it would be "a shame to lose the neighborhood to blacks." Defendant stated that one or two weeks prior to this time they had talked about "scaring them by throwing something to burn."

The statements of all three and the testimony of Hudgins and Barnes acknowledge that the two young men remained in defendant's home after he left on a mission to secure material for construction of Molotov cocktails.

Taking a two-gallon can from his home, defendant first went to the Shell gas station at 47th and California, where he filled it with gasoline. Thereafter, he drove to a White Hen Pantry at 59th and California and obtained bottles of Pepsi-Cola.

Upon his return home, the three entered defendant's basement, and defendant proceeded to assemble two Molotov cocktails by emptying the Pepsi out of the bottles, filling them with gasoline and placing cloth strips in the bottlenecks.

The defendant then developed a bombing strategy, *i.e.*, one bomb to be thrown through the front of the Waheed home at the same time a second bomb would be thrown through the rear of the home. In furtherance of the plan, Barnes would take the rear of the home and Hudgins the front.

Defendant provided a pair of gloves to each of the participants and a lighter to Barnes; Hudgins had his own lighter.

According to the previously established plan, Barnes and Hudgins, each now armed with a homemade bomb, walked together toward the Waheed home, but separated when they neared the home so that they could each confront their respective target.

Shortly thereafter, Barnes heard a bottle break followed by the appearance of Hudgins in the alley. Hudgins testified that he purposely broke his bottle because he "knew it wasn't right."

Barnes continued to execute the plan and threw his Molotov cocktail into the back of the Waheed home.

Barnes and Hudgins then returned to defendant's house to await the arrival of police and firefighters responding to the anticipated fire.

After a half-hour of waiting, it was apparent that the bomb had not ignited. Defendant then suggested that Barnes "should go back and this time go around the front, hit it again, and maybe this time it would

really do something." Thereafter, defendant fabricated a third Molotov cocktail and gave it to Barnes.

Barnes again went to the Waheed home, lit the third bomb, threw it through the front window, and returned to the defendant's house.

This time, their efforts were more successful. Soon the trio saw flashing lights indicating the arrival of fire and police units. At that time, they sat on defendant's front porch and, after awhile, disbursed to their respective homes.

On cross-examination, Barnes claimed that he did not know anybody was home at the Waheed residence when he threw the firebombs and that, prior to that night, he had never discussed the impact of black people moving into the neighborhood. He confessed that he did not know why he had thrown the bombs; however, on redirect examination, he acknowledged that the firebombing was racially motivated, although he claimed that he had no control over his own will and that somebody else was totally controlling him and he was possessed by "booze."

Shirley Waheed testified that she and her family moved into their three-bedroom home about March 1, 1986, four months prior to the related incident. The family consists of Shirley, her husband, brother-in-law, and four children ages 6 to 12. On the evening of July 5, 1986, the family retired for bed about 10 p.m. Mrs. Waheed was awakened at 4 a.m. when she heard her front room window break and saw flames. She unsuccessfully attempted to extinguish the fire with water. A man, later identified as Henry Szura, was driving by the home at that time, saw the fire and stopped to help extinguish the fire with a blanket taken from his car. Mrs. Waheed further testified that on the night of the firebombing, a light was on in the front room window through which the bomb was thrown and she always left a light on and that this light was fully visible from the outside of the home.

On appeal, the defendant first contends that the State did not show that he knew or reasonably should have known that the house was occupied when it was firebombed and thus was not proved guilty of aggravated arson beyond a reasonable doubt. Defendant concedes that sufficient evidence was shown to sustain his conviction for the lesser offense of arson.

The aggravated arson statute provides in relevant part that a "person commits aggravated arson when in the course of committing arson he knowingly damages, partially or totally, any building or structure, including any adjacent building or structure, and (1) he knows or reasonably should know that one or more persons are present therein." Ill. Rev. Stat. 1985, ch. 38, par. 20—1.1(a)(1).

Defendant clearly knew the Waheeds were residing at 5620 South Artesian on a daily basis since the evidence established that the Waheed family moved into their house in March 1986 and the firebombing did not occur until July 1986. It was the very presence of the Waheeds in that house against which defendant reacted. Defendant's admitted motivation for his egregious acts against the Waheeds was to get them out of the neighborhood because they were black. The evidence also revealed that the firebombing occurred about 4 a.m.; seven people, three adults and four children, lived in the Waheed home; and the vicinity where defendant and the Waheeds lived was a residential neighborhood.

Clearly, defendant is the architect of these misdeeds. He has the motive, secures the material, constructs the bombs, and gives rather precise instructions as to the manner in which the operation is to be carried out. He dispatches one young man to the front and one to the rear. Why? If his purpose is to "scare" the residents of the home, a single bomb should deliver the message to the new residents that they are not welcome in the neighborhood. The jury may certainly conclude that he might have known that the building was occupied at the time and wished to insure fires at both front and rear exit to impair escape.

■ Where a defendant contests the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89.

■ In determining that the defendant knew or reasonably should have known that the premises were occupied at the time of the fire, the jury could consider the time of the incident, the residential character of the building and the surrounding area, occupation of the premises by the Waheed family with their small children for more than four months, the method of attack selected by the defendant and the racial motivation by defendant to deliver some kind of message to his new neighbors. On these issues the trier of fact may assess the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence. *Young*, 128 Ill. 2d at 51.

■ Elements of aggravated arson may be shown by circumstantial evidence. Issues such as motive, opportunity or knowledge can be inferred from the surrounding facts of each case. *People v. Rosario* (1988), 166 Ill. App. 3d 383, 519 N.E.2d 1020.

■ In *People v. Dukes* (1986), 146 Ill. App. 3d 790, 497 N.E.2d 351, the trial testimony contained no direct evidence even linking the defend-

ants to the fire and the only evidence used as a basis for defendant's conviction was circumstantial in nature. In *Dukes* there was evidence that the premises were occupied and that at least one of its occupants viewed the defendants from the house, but none that would have directly shown that the defendants viewed or could have viewed the occupant. (In *Dukes*, the conviction for aggravated arson was vacated consistent with *People v. Wick* (1985), 107 Ill. 2d 62, 481 N.E.2d 676, and *People v. Johnson* (1986), 114 Ill. 2d 69, 499 N.E.2d 470, which struck down the 1983 aggravated arson statute on constitutional grounds.)

Accordingly, the jury could infer that defendant knew or reasonably should have known that the Waheed home was occupied when it was firebombed and the requisite elements of aggravated arson were established.

■■ Defendant next contends that the prosecutor made improper comments during rebuttal argument regarding defendant's knowledge that the house was occupied when the arson was committed. The complained-of remarks by the prosecutor are as follows:

"Mr. Burrett had to drive right by 5620 Artesian [the Waheed house] to arrive at the gas station at 47th and California. And when Mr. Burrett drove in front of 5620 Artesian *** that light in the living room, that Shirley Waheed told you was on, and in fact, was on every night, and we know it was on because John Barnes told you *** through his statement, that there was a light on, Mr. Burrett saw that same light."

Defendant argues that the evidence does not support the conclusion that defendant drove past the Waheed house and that he saw the light in the window.

Although there is evidence in the record that defendant left his house, which is south of the Waheed house, and proceeded north to 47th and California to secure the necessary gasoline, the record is silent as to his route. While it is not unreasonable to assume he took the most direct route, therefore passing the Waheed home and observing the light, such a conclusion is pure speculation.

Oft-cited *People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280, reversed a conviction where the prosecutor argued, without any evidence, that fingerprints were absent from the murder weapon because defendant had the presence of mind to wipe them off with her skirt. In *Beier* the court held that the misstatements of facts in the record were prejudicial to the accused. Although *Beier* remains authority for the impropriety of a prosecutor's arguing facts not in the record, the cases have often followed different paths.

Where the courts have concluded that the statements were enough to prejudice the outcome, a reversal has been warranted. *People v. Whitlow* (1982), 89 Ill. 2d 322, 433 N.E.2d 629 (although acknowledging no prejudicial effect for an isolated comment, the court reversed because of cumulative impact of a number of statements that may have prejudiced the jury); *People v. Giangrande* (1981), 101 Ill. App. 3d 397, 428 N.E.2d 503 (argument that hair adhered to tape on a box holding the body "was" the defendant's hair when the forensic scientist testified that the hair "could have belonged" to defendant); *People v. Curry* (1975), 25 Ill. App. 3d 637, 323 N.E.2d 778 (prosecutor's argument that defendant had passed a gun to another where there was no evidence of such a transfer).

However, where the evidence of defendant's guilt is otherwise persuasive, prosecutors are generally afforded wide latitude in closing arguments and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 521 N.E.2d 38.) Even if the improper argument relates to a key issue, as it does in the instant case, the verdict will stand if the State introduced other evidence which could serve as a basis for proof of that key issue. (*People v. Woods* (1969), 114 Ill. App. 2d 348, 252 N.E.2d 717.) As we have noted elsewhere in this opinion, the State introduced evidence on a multitude of factors which would allow the jury to infer that defendant should have known that the Waheed residence was occupied at the time of the arson.

In *People v. Carlson* (1982), 92 Ill. 2d 440, 442 N.E.2d 504, the prosecutor's misstatement of matters not in evidence was deemed harmless error. There the prosecutor advised the jury that an informant had previous conversations with defendant about drug sales although such occurrences were not in the record. If disclosure of such conversations did not adversely prejudice the jury in a prosecution involving the sale of a controlled substance, it is difficult to imagine that the assumption of defendant's route to the gas station in the case at bar would warrant reversal.

The *Carlson* court noted that the trial court had immediately admonished the jury that counsel's arguments were not evidence and observed that the jury had heard the evidence. A similar admonition was given by the court in the case at bar. Immediately after defense counsel's objection to the prosecutor's misstatement, the court stated "the jury has heard the evidence, they will rely on the evidence in reaching their decision."

This court has recently reaffirmed the standards to apply when the defendant asserts that he was denied a fair trial due to allegedly

improper closing arguments by the prosecutor. (*People v. Lewis* (1990), 198 Ill. App. 3d 976, 556 N.E.2d 697.) In *Lewis*, this court set forth the following principles: (a) in closing argument, a prosecutor is accorded wide latitude and the scope of permissible argument is within the sound discretion of the trial judge; (b) complained-of remarks must be examined in the context of both the State's and the defense's arguments, but all remarks made in the closing argument must be based upon the evidence presented or reasonable inferences thereof; and (c) the test for determining whether the remarks of the prosecutor in closing argument constitute reversible error is whether those comments were such that, without their having been made, the jury might have reached a different result. *Lewis*, 198 Ill. App. 3d at 982.

■ Like *Woods* and *Carlson*, this case is distinguished from *People v. Beier*. We find that the prosecutor's remarks in this case do not constitute reversible error.

Lastly defendant asserts that the 18-year prison sentence was excessive. Defendant relies on cases where sentences were reduced due to the disparity between the punishment imposed on codefendants (*e.g.*, *People v. Hall* (1973), 17 Ill. App. 3d 1, 307 N.E.2d 664), and on cases where less severe sentences were received for aggravated arson convictions (*e.g.*, *People v. Dukes* (1986), 146 Ill. App. 3d 790, 497 N.E.2d 351). We find defendant's arguments unpersuasive.

■ The standard used to determine whether a sentence is excessive is whether the trial judge abused his discretion. (*People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541.) Aggravated arson is a Class X felony. (Ill. Rev. Stat. 1985, ch. 38, par. 20—1.1(b).) The statutory sentencing range for a Class X felony is 6 to 30 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(3).) Thus defendant received the exact mid-point of the statutory limitations established for aggravated arson.

■ A trial judge is statutorily authorized to consider in his sentencing decision certain aggravating factors, including the need to deter others from committing the same crime. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(7).) In this case we find that the trial court properly considered the deterrence factor in imposing its sentence. The outrageous conduct of defendant, admittedly motivated by blatant racism, needs to be deterred and warrants the sentence imposed.

■ Defendant argues that his sentence was excessive as compared to Barnes, who received a six-year sentence after pleading guilty to aggravated arson. However, persons convicted of the same offense are not required to receive identical sentences (*People v. Ashford* (1988), 121 Ill. 2d 55, 88, 520 N.E.2d 332) and disparity between the sentences of equally culpable defendants is entirely proper where it is warranted by

differences in the nature and extent of each defendant's participation in the crime (*People v. Williams* (1989), 180 Ill. App. 3d 294, 535 N.E.2d 993).

At the sentencing hearing, defendant presented a black co-worker as a witness in mitigation. The co-worker, Bonnie William Thomas, Jr., stated that he considered defendant a friend, they had visited each other's homes and he never detected any bias on the part of defendant. To this court such testimony is in aggravation, not mitigation, since defendant's relationship with Mr. Thomas should have shown him the irrationality of his mindset toward the Waheeds.

Defendant clearly instigated and led the attack on the Waheed family. He initially suggested burning down the home, planned the attack, purchased the required materials, manufactured the Molotov cocktails, and provided Barnes and Hudgins with gloves and a lighter and specific directions on carrying out their respective tasks.

Defendant led the attack by guiding and inducing the behavior of Barnes and Hudgins. At the time of the firebombing, Barnes and Hudgins were about 19 years old and the defendant 42. Defendant's son Erik was the same age as the young men and both acknowledged that they had grown up in the neighborhood and been close friends with defendant's son.

In testimony and statements, Barnes and Hudgins consistently refer to defendant as "Mr. Burrett" rather than "Harry." He is a respected figure of authority to them.

Instead of mature guidance, they received a lesson of hate and prejudice. We are reminded of the simple message of a song from *South Pacific*:

> "You've got to be taught to hate and fear.
> You've got to be taught from year to year.
> It's got to be drummed in your dear little ear.
> You've got to be carefully taught.
> You've got to be taught to be afraid
> Of people whose eyes are oddly made,
> And people whose skin is a different shade,
> You've got to be carefully taught.
> You've got to be taught before it's too late,
> Before you are six or seven or eight,
> To hate all the people your relatives hate,
> You've got to be carefully taught.
> You've got to be carefully taught." R. Rodgers & O. Hammerstein, "You've Got To Be Carefully Taught," copyright 1949.

We find that the trial court did not abuse its discretion in sentencing defendant to 18 years' imprisonment.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

CERDA, P.J., and RIZZI, J., concur.